UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------x
BINOR FAISON,

    Plaintiff,                              **COMPLAINT**

vs.

BUCKEYE PARTNERS, L.P.,

    Defendant.
------------------------------------------------x

By and through his counsel, Michael H. Sussman, plaintiff, Binor Faison, states and alleges as follows:

## I. PARTIES

1. Plaintiff, Binor Faison, resides in the Town of Newburgh. He is 48 years of age and African-American.

2. Defendant Buckeye Partners, LP, is a corporation which transacts business in the State of New York. It is the business of oil storage and distribution.

3. At all relevant times, defendant employed plaintiff.

## II. JURISDICTION

4. As plaintiff contends that defendant violated his rights pursuant to 42 U.S.C. section 1981[a], as amended, this Court has

1

jurisdiction over this matter pursuant to 28 U.S.C. section 1331, 1343 (c) & (d) and 1363 and 42 U.S.C. section 1988.

### III. STATEMENT OF FACTS

5. In April 12, 2012, plaintiff commenced working with defendant.

6. Plaintiff worked for defendant until his resignation on December 4, 2017.

7. Plaintiff's job title was terminal operator and he successfully performed his job despite an absence of any cooperation from his Caucasian co-workers.

8. Buckeye Partners, L.P. (NYSE: BPL) is a publicly traded master limited partnership which owns and operates, or owns a significant interest in, a diversified global network of integrated assets providing midstream logistic solutions, primarily consisting of the transportation, storage, processing and marketing of liquid petroleum products.

9. Buckeye is one of the largest independent liquid petroleum products pipeline operators in the United States in terms of volumes delivered, with approximately 6,000 miles of pipeline. Buckeye also uses its service expertise to operate and/or maintain

third-party pipelines and perform certain engineering and construction services for its customers.

10. Buckeye's global terminal network, including through its interest in VTTI B.V. ("VTTI"), comprises more than 135 liquid petroleum products terminals with aggregate tank capacity of over 178 million barrels across our portfolio of pipelines, inland terminals and marine terminals located primarily in the East Coast, Midwest and Gulf Coast regions of the United States as well as in the Caribbean, Northwest Europe, the Middle East and Southeast Asia.

11. Buckeye's global network of marine terminals enables it to facilitate global flows of crude oil and refined petroleum products, offering its customers connectivity between supply areas and market centers through some of the world's most important bulk liquid storage and blending hubs.

12. Buckeye's flagship marine terminal in The Bahamas, Buckeye Bahamas Hub, is one of the largest marine crude oil and refined petroleum products storage facilities in the world and provides an array of logistics and blending services for the global flow of petroleum products. Buckeye's Gulf Coast regional hub,

Buckeye Texas Partners, offers world-class marine terminalling, storage and processing capabilities.

13. Through its 50% equity interest in VTTI, Buckeye's global terminal network offers premier storage and marine terminalling services for petroleum product logistics in key international energy hubs. Buckeye is also a wholesale distributor of refined petroleum products in certain areas served by its pipelines and terminals.

14. In January-February 2017, a white co-worker, Rob Strieb and plaintiff were at work in Buckeye's facility in the Town of Newburgh, New York.

15. Plaintiff was working outside on the dock attending to the barge.

16. Rob Strieb, a Caucasian, was in the office monitoring the transfer of oil from the barge to the company's storage tasks.

17. As part of Strieb's responsibility, upon the transfer of oil from the barge to the company's storage tanks, he was to close a land-based valve.

18. Strieb requested that plaintiff close the valve and plaintiff responded that this was Strieb's responsibility.

19. Despite this, as plaintiff walked in from the dock, he stopped to close the valve.

20. Strieb pulled up the valve in a company pick up and there and then brandished a knife and wrench and made threatening comments to plaintiff.

21. Plaintiff told Strieb not to threaten him and reported the incident to defendant's Regional Manager Chris Rodden.

22. Rodden advised plaintiff to go home, but did not then suspend him.

23. Strieb then entered the office and called Rodden and fabricated an account of events, claiming that plaintiff had threatened him.

24. A few days later, plaintiff attended a meeting with the defendant's HR regional supervisor, Rita Schantz, a Caucasian, John Clark, another Caucasian and the head terminal operator in Newburgh, and Rodden, and was given a two week suspension for the event he reported.

25. Defendant gave Strieb, the white employee who pulled a knife on plaintiff, the identical punishment as plaintiff.

26. Within the last three years, both after he was disciplined for reporting the fact that a co-worker had pulled a knife on him and before those events, plaintiff's employment has been dominated by offensive racist comments:

(a) Clark suggested that he and plaintiff "nigger" rig a pump; when plaintiff questioned this language, Clark simply brushed it off;

(b) on another occasion, plaintiff and Clark were speaking after a meeting and Clark remarked that there was "no fucking way" he would ever let his daughter date a black man and that it was bad enough she was married to a Mexican. Clark further stated this his son could fuck as many black girls as he wanted to; when plaintiff responded that his comments were racist, Clark told him, "I don't care what you say."

(c) in June 2016, following the suspension referred to in paragraph 18 above, Strieb told plaintiff that Clark wears the hood, a reference to the Ku Klux Klan;

(d) in June 2016, Strieb stated that John only burns his cross half-way;

(e) Strieb would frequently refer to plaintiff as the HNIC – "house nigger in charge."

(f) John Clark intentionally confused the work renege with "renigger."

(g) on another occasion, Clark called the terminal and, while speaking with plaintiff, called him an "uncle tom."

(h) after the election of Donald Trump as President, Strieb stated "it's good we are back in office."

(i) The work environment was otherwise permeated with racial ridicule and intimidation: Clark would call people from India "towel head," "Hajji" and "camel jockeys"; he would state that Indian women's pussies tasted like curry or goat because they ride goats and all they eat is curry or spicy foods; Clark would also refer to people from Mexico as wetbacks and bean eaters.

(j) Strieb spoke at work about sponsoring a KKK meeting and expressed repeatedly his support for that organization;

(k) Strieb repeatedly played racist videos on his cell phone at work;

(l) Plaintiff asked Strieb about working overtime; Strieb responded "Fuck that shit, nigger, I'm working that shit."

(m) While speaking on the phone, Strieb addressed plaintiff as "my nigger."

(n) Mike Yoder, the facility engineer, indicated he wanted to have sex with a black woman; he started looking on web sites and told plaintiff that he wanted to fuck as many of these "black sista girls" as he could.

(o) After plaintiff indicated that he was not interested in buying Strieb's pick-up truck, Strieb stated, "You don't know what you are missing, my nigger."

(p) Dave Gandee, a terminal specialist who gave plaintiff directions and instruction, asked plaintiff whether use of the "n" word bothered him.

27. Plaintiff frequently challenged the use of racially offensive language in his presence, but this had no effect on curtailing its common usage at his work place.

28. Plaintiff was earning $34.00/hour but resigned from employment with defendant because he could not deal with the pervasive racism he was forced to confront on a day-to-day basis.

29. After plaintiff resigned, the defendant did not perform a normal and customary exit interview.

30. Said name-calling and language, as well as the discipline to which he was unjustly subjected, created a racially hostile environment for plaintiff.

31. Plaintiff never received from defendant any policy explaining who, if anyone, he could complain to about the racist atmosphere he faced at work.

32. Since plaintiff experienced racist comments from peers, supervisors and managers, he did not view it as practical or reasonable to complain to any of them about how he was being treated and addressed

33. The racially hostile environment plaintiff experienced caused him anxiety, stress, humiliation and anger and significantly burdened his discharge of job functions.

34. The involvement of defendant's managers and supervisors in the creation of the racist environment to which plaintiff was continually exposed demonstrates a degree of wanton disregard for the nation and state's civil rights law as to predicate punitive damages.

35. Since he resigned due to the racially hostile work environment he daily faced, plaintiff has been unable to find

comparable employment, working for half the hourly salary he had been earning with the NY State Department of Transportation and recently commencing a new job in Rockland County, much further from his home, for approximately two-thirds of the salary he earned while employed by defendant.

## IV. **CAUSES OF ACTION**

36. Plaintiff incorporates paras. 1-35 as if fully restated herein.

37. By creating a racially hostile environment, defendant violated 42 U.S.C. section 1981(a) and burdened the terms and conditions of his employment.

38. By creating and racially hostile environment, defendant violated section 296 of the Executive Law of the State of New York.

39. By and through the creation of a racially hostile environment, defendant constructively discharged plaintiff in violation of 42 U.S.C. sec. 1981(a).

40. By and through the creation of a racially hostile environment, defendant constructively discharged plaintiff in violation of section 296 of the Executive Law of the State of New York.

## V. **PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays that this Honorable Court accept jurisdiction over this matter, empanel a jury to hear and decide both defendant's liability and the damages, both compensatory and punitive, due and owing to plaintiff, and award attorneys' fees and costs to plaintiff.

Dated: January 3, 2019

Respectfully submitted,

MICHAEL H. SUSSMAN

SUSSMAN & ASSOCIATES
Counsel for Plaintiff Faison

1 Railroad Avenue, Ste. 3
Goshen, N Y 10924
(845)-294-3991